**Martha Sabol WRIGHT; John C. Wright, Jr., Plaintiffs–Appellants,**

v.

**METROHEALTH MEDICAL CENTER, Defendant–Appellee,**

**Petroleum Helicopters, Inc., Defendant.**

No. 94–3548.

United States Court of Appeals, Sixth Circuit.

Argued May 22, 1995.

Decided July 13, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 1, 1995.

Barbara Kaye Besser, Elfvin & Besser, Cleveland, OH (argued and briefed), for plaintiffs-appellants.

Robert M. Wolff, Duvin, Kahn, Barnard & Messerman, Cleveland, OH (argued and briefed), for defendant-appellee.

Before: MILBURN and BATCHELDER, Circuit Judges; TODD, District Judge.[*]

MILBURN, Circuit Judge.

Plaintiffs Martha Sabol Wright and John C. Wright, Jr. appeal the district court's order granting summary judgment to defendant MetroHealth Medical Center ("Metro-Health") in this 42 U.S.C. § 1983 action in which plaintiffs allege that the application of defendant MetroHealth's nepotism policy to plaintiffs violated the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. Plaintiffs also appeal the district court's order granting defendant Metro-Health's and Petroleum Helicopters, Inc.'s ("PHI") motions to dismiss plaintiffs' state law claims pursuant to Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6). On appeal, the issues are (1) whether the district court erred in finding that MetroHealth's nepotism policy did not violate plaintiffs' fundamental right to marry, and (2) whether the district court erred in dismissing plaintiffs' state law claims. For the reasons that follow, we affirm.

I.

A.

Plaintiff Martha Sabol Wright has been employed as a registered nurse by defendant MetroHealth, a public hospital that is located in Cuyahoga County, Ohio, since October 1984.[1] Pursuant to a contract with Metro-Health, defendant PHI[2] provides helicopters and pilots to MetroHealth for its emergency airlift medical service, LifeFlight. Plaintiff John C. Wright, Jr. has been employed by PHI as a helicopter pilot since 1985.

Each LifeFlight helicopter is staffed with two PHI pilots, a MetroHealth doctor, and a MetroHealth registered nurse. In March 1990, Martha was assigned to the LifeFlight unit in which John is a pilot. In October 1991, Martha and John became engaged, and in December 1991, they began cohabitating. Soon thereafter, Martha and John informed their respective employers of their living situation and their intentions to be married. On November 17, 1992, MetroHealth informed plaintiffs that as a married couple in the same unit, they would be in violation of MetroHealth's nepotism policy and that one of them would have to transfer to another unit.

MetroHealth's nepotism policy states in relevant part as follows:

IX. *NEPOTISM*

A. In order to prevent conflicts which may arise in situations where members of the same immediate family are employed by the Hospital, the Hospital will not allow an individual to be employed, transferred or promoted, where as a result, any of the following situations would exist: ...

3. Members of the same immediate family being in positions which are of such close proximity that they would necessarily interact with each other in the performance of their duties ...

---

[*] The Honorable James D. Todd, United States District Judge for the Western District of Tennessee, sitting by designation.

1. MetroHealth is a county hospital operating under Chapter 339 of the Ohio Revised Code. As such, it is subject to the mandates of the Constitution and 42 U.S.C. § 1983.

2. During the pendency of this appeal, defendant PHI settled its claims with plaintiffs and is no longer a party to this appeal.

C. If, as a result of a marriage between two employees, a violation of the Nepotism guidelines arises, the affected employees will be given the option of electing which spouse will be moved to another position in the Hospital System so as to eliminate the nepotism violation. If no election is made by either spouse in thirty (30) calendar days after notice to the employees, the least senior in terms of Hospital seniority will be moved. All reasonable attempts will be made to insure that the displaced employee is given a position of comparable responsibility and pay.

J.A. 25–26. MetroHealth offered to transfer Martha to any available position of the same grade and pay in another unit, but she refused. Plaintiffs were married on December 19, 1992. On December 20, 1992, Metro-Health requested that PHI transfer John from the LifeFlight crews, and the next day, PHI informed John that he was being transferred, effective January 19, 1993, to Louisiana.

### B.

On January 13, 1993, plaintiffs filed this action in the Court of Common Pleas of Cuyahoga County, Ohio, naming Metro-Health and PHI as defendants. In their complaint, plaintiffs alleged that Metro-Health's application of its nepotism policy to plaintiffs violated the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States in violation of 42 U.S.C. § 1983. Plaintiffs also alleged that (1) MetroHealth tortiously interfered with John's business relationship with PHI, (2) that Me-troHealth's and PHI's conduct constituted intentional infliction of emotional distress, (3) that MetroHealth's and PHI's conduct violated Ohio public policy, and (4) that Metro-Health's and PHI's conduct constituted sex discrimination in violation of Ohio Revised Code ("O.R.C.") § 4112.99. Defendants removed the action to federal court on January 15, 1993.

After this action was filed, defendants agreed not to transfer John, but instead, to transfer Martha to another unit of the hospital. The parties also agreed that during the pendency of the trial, MetroHealth would not transfer Martha from the LifeFlight unit. In that regard, MetroHealth scheduled Martha's assignments so that Martha and John did not fly together in the same helicopter.

On January 25, 1993, MetroHealth moved to dismiss the case pursuant to Fed.R.Civ.P. 12(b)(6), and on February 8, 1993, PHI filed a similar motion. Thereafter, the parties engaged in extensive settlement discussions that resulted in a stipulated settlement on April 20, 1993. However, the parties were unable to finalize the settlement, and on May 12, 1993, plaintiffs sought to vacate the settlement and reopen the proceedings.

On May 27, 1993, MetroHealth filed a supplemental brief in support of its motion to dismiss and its alternative motion for summary judgment with regard to plaintiffs' 42 U.S.C. § 1983 claim. On January 11, 1994, plaintiffs filed a cross-motion for partial summary judgment against MetroHealth on their § 1983 claim. The district court officially vacated the settlement and reopened the case on January 12, 1994. On April 25, 1994, the district court granted MetroHealth's motion for summary judgment with regard to plaintiffs' 42 U.S.C. § 1983 claim. The district court also granted MetroHealth's and PHI's motions to dismiss plaintiffs' state law claims. This timely appeal followed.

### II.

Plaintiffs argue that the district court erred in granting summary judgment to MetroHealth as to plaintiffs' 42 U.S.C. § 1983 claim. "We review a district court's grant of summary judgment de novo." *Brooks v. American Broadcasting Cos.*, 932 F.2d 495, 500 (6th Cir.1991). We will affirm a district court's order granting summary judgment "only if we determine that the pleadings, affidavits, and other submissions show 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Michigan Protection & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) (quoting Fed.R.Civ.P. 56(c)). All evidence must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.

1348, 1356, 89 L.Ed.2d 538 (1986). However, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Babin*, 18 F.3d at 341 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)).

## A.

First, plaintiffs argue that MetroHealth's nepotism policy violates their fundamental right to marry and that the district court erred in failing to subject the nepotism policy to strict scrutiny review.[3] Plaintiffs assert that the district court improperly focused exclusively on whether MetroHealth's nepotism policy violated plaintiffs' employment rights and failed to consider whether the policy violated plaintiffs' fundamental right to marry. Plaintiffs rely on *Littlejohn v. Rose*, 768 F.2d 765 (6th Cir.1985), *cert. denied*, 475 U.S. 1045, 106 S.Ct. 1260, 89 L.Ed.2d 570 (1986), wherein we held that the district court erred in holding that the plaintiff had failed to state a viable constitutional claim where the plaintiff's employment contract had not been renewed after it expired because of the plaintiff's involvement in a divorce. *Littlejohn*, 768 F.2d at 768. The district court reasoned that although the plaintiff could not be fired for this reason, she had failed to state a constitutional claim because she did not have a property right in her job. *Id.* at 769. We held that a person may not be denied public employment because of a constitutionally protected activity regardless of whether a person has a property right in his or her job. *Id.* However, plaintiffs' reliance on *Littlejohn* is misplaced. In this case, the district court first evaluated whether MetroHealth's nepotism policy directly and substantially interfered with plaintiffs' right to marry. Upon concluding that it did not, the district court then determined that plaintiffs did not have a protected property or liberty interest in their jobs. Therefore, unlike the district court in *Littlejohn*, the district court in this case did not hold that plaintiffs were foreclosed from arguing that their fundamental right to marry had been violated *because* it found that plaintiffs did not have a property or liberty interest in their particular positions. Accordingly, we conclude that the district court properly considered whether MetroHealth's nepotism policy infringed upon plaintiffs' fundamental right to marry.

■ In evaluating the constitutionality of MetroHealth's nepotism policy, "'we must first determine what burden of justification the classification created thereby must meet, by looking to the nature of the classification and the individual interests affected.'" *Zablocki v. Redhail*, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978) (quoting *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 253, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974)). It is well established that the right to marry is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment. *See, e.g., Planned Parenthood v. Casey*, —— U.S. ——, ——, 112 S.Ct. 2791, 2805, 120 L.Ed.2d 674 (1992); *Zablocki*, 434 U.S. at 383–85, 98 S.Ct. at 679–81; *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967); *Littlejohn*, 768 F.2d at 768. Furthermore, the Supreme Court has held that "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388, 98 S.Ct. at 682. However, the Court has also held that not every state action "which relates in any way to the incidents of or the prerequisites for marriage must be subjected to rigorous scrutiny." *Id.* at 386, 98 S.Ct. at 681. "To the contrary, reasonable regula-

---

**3.** Plaintiffs also argue that MetroHealth's nepotism policy infringes upon their First Amendment right to freedom of association. *See Adkins v. Board of Education of Magoffin County*, 982 F.2d 952 (6th Cir.1993); *Newsom v. Norris*, 888 F.2d 371 (6th Cir.1989). However, plaintiffs failed to raise this issue before the district court and thus, have not preserved the issue for appeal. *Noble v. Chrysler Motors Corp., Jeep Div.*, 32 F.3d 997, 1002 (6th Cir.1994) (holding that absent exceptional circumstances, courts will not normally address an issue not first raised in the district court).

tions that do not significantly interfere with decisions to enter into the marital relationship may be imposed." *Id.* Therefore, in order to determine whether we review MetroHealth's nepotism policy under a strict scrutiny or a rational basis analysis, we must determine whether MetroHealth's nepotism policy "significantly interfere[s]" with the decision to marry. *See Parks v. City of Warner Robins, Georgia,* 43 F.3d 609, 613 (11th Cir.1995). Thus, we turn to prior Supreme Court cases discussing the right to marry for guidance.

In *Loving,* the Supreme Court held that an anti-miscegenation statute, which voided interracial marriages and made them punishable as felonies, violated the "freedom of choice to marry." *Loving,* 388 U.S. at 12, 87 S.Ct. at 1823. Similarly, in *Zablocki,* the Court invalidated a Wisconsin statute that provided that any resident who had child support obligations must obtain a court order before he or she could marry. *Zablocki,* 434 U.S. at 387, 390–91, 98 S.Ct. at 681, 683–84. The Court held that the statute, which voided marriages contracted in any jurisdiction without the required court order and subjected violators to criminal punishment, was an impermissible direct restraint on the right to marry. *Id.* at 375, 387, 390–91, 98 S.Ct. at 675, 681, 683–84. In holding that the statutory classification at issue in *Zablocki* interfered "directly and substantially with the right to marry[,]" the Court explained:

> Some of those in the affected class ... will never be able to obtain the necessary court order.... These persons are absolutely prevented from getting married. Many others, able in theory to satisfy the statute's requirements will be sufficiently burdened by having to do so that they will in effect be coerced into forgoing their right to marry.

*Zablocki,* 434 U.S. at 387, 98 S.Ct. at 681.

On the other hand, in the same term that the Court decided *Zablocki,* the Court upheld a Social Security provision that terminated benefits to a secondary beneficiary if he or she married a person ineligible for Social Security benefits. *Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977).

In *Zablocki,* the Court distinguished the situation in *Jobst* explaining:

> The directness and substantiality of the interference with the freedom to marry distinguish the instant case from ... [*Jobst*]. The Social Security provisions placed no direct legal obstacle in the path of persons desiring to get married, and ... there was no evidence that the laws significantly discouraged, let alone made "practically impossible," any marriages.

*Zablocki,* 434 U.S. at 387–88 n.12, 98 S.Ct. at 681–82 n.12 (citation omitted).

In *Parks v. City of Warner Robins, Georgia,* the Eleventh Circuit held that the City's anti-nepotism policy did not directly and substantially interfere with the right to marry. *Parks,* 43 F.3d at 614. The court explained that "[t]he [anti-nepotism] policy does not create a direct legal obstacle that would prevent absolutely a class of people from marrying. While the policy may place increased economic burdens on certain city employees who wish to marry one another, the policy does not forbid them from marrying." *Id.* The court further stated, "Any increased economic burden created by the anti-nepotism policy is no more than an incidental effect of a policy aimed at maintaining the operational efficiency of Warner Robins' governmental departments, not a direct attempt to control the marital decisions of city employees." *Id.;* *see Parsons v. County of Del Norte,* 728 F.2d 1234, 1237 (9th Cir.) (per curiam) (holding that City's no-nepotism rule did not threaten or unduly burden the plaintiff's right to marry or remain married), *cert. denied,* 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Cutts v. Fowler,* 692 F.2d 138 (D.C.Cir.1982) (holding that the burden on the right to marry caused by anti-nepotism rules is "attenuated and indirect"). "Moreover, individual instances of hardship notwithstanding, the anti-nepotism policy at issue here does not make marriage practically impossible for a particular class of persons." *Parks,* 43 F.3d at 614; *see Jobst,* 434 U.S. at 54, 98 S.Ct. at 99.

 We adopt the reasoning of the Eleventh Circuit in *Parks.* MetroHealth's nepotism policy does not create a legal obstacle that would prevent a class of people from

marrying. The fact that plaintiffs married with knowledge of the nepotism policy illustrates this point. Furthermore, we note that MetroHealth's nepotism policy merely requires that one spouse transfer to another department; it does not require one spouse to be terminated when the policy is violated. Therefore, we conclude that MetroHealth's nepotism policy does not directly and substantially interfere with the fundamental right to marry, and thus, we hold that the district court did not err in subjecting the policy to rational basis scrutiny.[4]

Second, plaintiffs argue that the district court erred in finding that MetroHealth's nepotism policy was rationally related to a legitimate government interest. "Under this analysis, an ordinance or regulation is invalid if it fails to advance a legitimate governmental interest or if it is an unreasonable means of advancing a legitimate governmental interest." *Curto v. City of Harper Woods*, 954 F.2d 1237, 1243 (6th Cir.1992) (per curiam) (citing *Williamson v. Lee Optical*, 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955)). However, the state actor "need not show that its ordinance provides the best

means for achieving its stated ends, only that these means are rational in view of its goals." *Interstate Towing Ass'n v. City of Cincinnati, Ohio*, 6 F.3d 1154, 1166 (6th Cir.1993). Moreover, the state actor is not required to state the purpose of its ordinance or regulation if the reviewing court may glean these reasons from the record. "Such supposition is adequate for purposes of performing [a rationally related analysis]." *Curto*, 954 F.2d at 1243.

■ MetroHealth states that its nepotism policy is necessary to (1) avoid potential conflicts that might arise when two closely related persons allow their personal lives to impinge on their professional lives, and (2) prevent morale among other workers from deteriorating due to the unique relationship between the married co-workers. We agree with the district court that these reasons provide a rational basis for MetroHealth's nepotism policy that furthers a legitimate governmental interest.[5] We also note that many other circuits have held that various nepotism policies furthered legitimate governmental interests and thus met rational basis scrutiny. *See, e.g., Parks*, 43 F.3d at

---

4. Plaintiffs argue that MetroHealth's nepotism policy also infringes upon their fundamental right to work. The Supreme Court has held that the "freedom to choose and pursue a career" is a protected liberty interest. *Parate v. Isibor*, 868 F.2d 821, 831 (6th Cir.1989) (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923)). In *Parate*, we held that the right to pursue a career was not implicated when the plaintiff was terminated because the plaintiff was free to work at other universities. *Parate*, 868 F.2d at 832. Similarly, in *Sullivan v. Brown*, 544 F.2d 279 (6th Cir.1976), we held that the transfer of a tenured teacher did not implicate her liberty interest under the Fourteenth Amendment. *Sullivan*, 544 F.2d at 283. In this case, MetroHealth merely wished to transfer one spouse from its LifeFlight unit. Plaintiffs were not in any way foreclosed from pursuing their careers with defendants. Thus, we conclude that MetroHealth's nepotism policy did not infringe upon the right of plaintiffs to pursue their careers.

5. Plaintiffs argue that the district court erred in failing to require that MetroHealth provide a factual basis showing that its nepotism policy is rationally related to the stated interests of avoiding conflicts of interests and preventing a deterioration in morale. In support of this proposition, plaintiffs rely on *Dothard v. Rawlinson*, 433

U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), *EEOC v. The Rath Packing Co.*, 787 F.2d 318 (8th Cir.), *cert. denied*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986), and *Meinhold v. United States Dep't of Defense*, 808 F.Supp. 1455 (C.D.Cal.1993), *aff'd in part, vacated in part*, 34 F.3d 1469 (9th Cir.1994). However, *Dothard* and *Rath Packing* are Title VII cases, and plaintiffs' reliance on these cases is misplaced because plaintiffs do not argue that MetroHealth's nepotism policy has a disparate impact on a protected group. Similarly, plaintiffs' reliance on *Meinhold* is also misplaced. In *Meinhold*, the district court relied on *Pruitt v. Cheney*, 963 F.2d 1160 (9th Cir.1991) (order), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992), wherein the Ninth Circuit applied "active" rational basis scrutiny pursuant to which a court reviews *"to see whether the government had established on the record* a rational basis for the challenged discrimination." *Pruitt*, 963 F.2d at 1166 (emphasis in original). However, in *Pruitt*, the court explained that this standard applied to cases involving discrimination. *Id.* at 1165 (holding that discriminatory classification of homosexuals violated the Equal Protection Clause). In this case, plaintiffs do not allege that MetroHealth's nepotism policy was based on discriminatory motives. Thus, we conclude that the district court did not err in finding that MetroHealth's nepotism policy advanced the interests put forth by MetroHealth.

615 (upholding under a rational basis scrutiny an anti-nepotism policy as a means of "avoiding conflicts of interests between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; preventing family conflicts from affecting the workplace; and, by limiting inter-office dating, decreasing the likelihood of sexual harassment in the workplace"); *Parsons,* 728 F.2d at 1237 (holding that an anti-nepotism statute is rationally related to the government interests of avoiding conflicts of interest and favoritism); *Cutts,* 692 F.2d at 141 (same).[6]

■ Plaintiffs further argue that MetroHealth's nepotism policy is not a reasonable means of advancing its stated purpose. In other words, plaintiffs assert that MetroHealth's application of its nepotism policy contradicts the policy's stated goals. Specifically, plaintiffs allege that "MetroHealth's sporadic and selective application of the Nepotism Policy belies the need for the policy and clearly proves that the hospital can, and does, function efficiently and effectively *without* such a policy and without compromising patient care or safety." Plaintiffs' Brief at 21 (emphasis in original).[7] In support of this contention, plaintiffs note that MetroHealth has failed to take action against several alleged violations of its nepotism policy. Thus, plaintiffs argue that this proves that these alleged violations have not disrupted the hospital and dispute MetroHealth's rationale for its nepotism policy.

MetroHealth determines whether a relationship violates its nepotism policy on a case-by-case basis. When faced with a possible violation of the nepotism policy, MetroHealth's Vice President of Human Resources analyzes whether family members work in "close proximity" to each other, and whether a family member supervises another family member. Because this determination is subjective, some spouses are permitted to work together. In addition, MetroHealth admitted that it became aware during discovery of violations of its policy of which it had previously been unaware. However, these facts do not show that MetroHealth's nepotism policy is not rationally related to the legitimate governmental interests of avoiding conflicts of interests and preventing morale problems. MetroHealth explains that because of "[t]he high-pressure, high-profile, high-stakes nature of the LifeFlight unit," MetroHealth is more greatly concerned with nepotism violations in this unit than in any other unit or department in the hospital. Defendant's Brief at 19. Thus, consistent with the governmental interests behind the nepotism policy, MetroHealth may rationally determine that under certain circumstances, a married couple working in the same unit or department would not violate its nepotism policy. Therefore, we conclude that MetroHealth's nepotism policy, which prevents

**6.** Plaintiffs also argue that the actual purpose of MetroHealth's nepotism policy is administrative ease and convenience. Relying on *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), plaintiffs assert that the policy is unconstitutional because the Supreme Court has held that administrative ease and convenience is not a legitimate governmental interest. *Craig,* 429 U.S. at 198, 97 S.Ct. at 457. However, *Craig,* which dealt with gender-based classifications that require a more stringent standard of review, is inapposite to this case. Moreover, MetroHealth does not argue that it implemented its nepotism policy for administrative ease and convenience; rather, MetroHealth asserts that its nepotism policy furthers the legitimate governmental interest of avoiding conflicts of interest and preventing morale problems.

**7.** It is not clear whether plaintiffs argue on appeal that MetroHealth's selective enforcement of its nepotism policy violates the Equal Protection Clause. *See* Plaintiffs' Brief at 21 n. 15; Plaintiffs' Reply Brief at 5. Nonetheless, this argument is meritless. Selective enforcement of a facially constitutional regulation does not, by itself, violate equal protection. *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *Birth Control Centers, Inc. v. Reizen,* 743 F.2d 352, 359 (6th Cir.1984). "A claim of selective application of a facially lawful state regulation requires a showing that ... the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992). Because plaintiffs do not allege invidious discrimination because of an impermissible consideration or that MetroHealth acted in bad faith, we conclude that the district court did not err in granting summary judgment to MetroHealth on this basis.

spouses from working together in the same unit, is rationally related to the legitimate governmental interest of avoiding conflicts of interest and preventing harm to the morale of other employees.

Likewise, we find no merit in plaintiffs' argument that MetroHealth's application of its nepotism policy to plaintiffs does not further MetroHealth's goals because plaintiff John C. Wright, Jr. is not an employee of MetroHealth. Plaintiffs assert that their marriage does not implicate the concerns that the nepotism policy is intended to address because they are not both employed by MetroHealth. However, this fact does not diminish MetroHealth's concern that married couples might "allow their personal lives to impinge on their professional lives." Defendant's Brief at 18. Therefore, we conclude that because plaintiffs' work in the same unit, MetroHealth's concerns regarding married couples who work together are equally valid in this case.[8] Accordingly, we hold that the district court did not err in concluding that MetroHealth's nepotism policy passed constitutional muster.

### B.

Plaintiffs argue that the district court erred in dismissing their pendent state law claims pursuant to Fed.R.Civ.P. 12(b)(6). We review the district court's grant of a motion to dismiss de novo. *Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir.1994). In this regard, we accept the allegations contained in the plaintiff's complaint as true. *Walker Process Equip. Inc. v. Food. Mach. and Chem. Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965);

*Carlson v. Conklin*, 813 F.2d 769, 772 (6th Cir.1987). " '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cameron*, 38 F.3d at 270 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In considering a motion under Fed.R.Civ.P. 12(b)(6), it is not the function of the court to weigh the evidence or evaluate the credibility of witnesses, *id.;* instead, the court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991 F.2d 1236, 1240 (6th Cir.1993). A district court may not grant dismissal under Fed.R.Civ.P. 12(b)(6) merely because it does not believe the factual allegations of the complaint. *Allard*, 991 F.2d at 1240.

#### (1)

■ Plaintiffs argue that the district court erred in dismissing their tortious interference with a business relationship claim. Under Ohio law,

a cause of action for [tortious interference with business relations] is made out when

> "... one who, *without a privilege to do so*, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another...."

---

8. Plaintiffs also argue that even if the MetroHealth's nepotism policy does not violate their fundamental right to marry, the district court erred in finding that MetroHealth's nepotism policy was applicable to plaintiff John C. Wright, Jr. Specifically, plaintiffs assert that because John is an employee of PHI, and not an employee of MetroHealth, plaintiffs' marriage does not violate MetroHealth's nepotism policy, which prohibits members of the same immediate family who are "employed by the Hospital" from working together in close proximity. J.A. 26.

However, as noted by the district court, the contract between MetroHealth and PHI stipulates that PHI employees will conform to MetroHealth rules. Thus, John is subject to Metro-

Health's nepotism policy pursuant to the contract. Furthermore, even assuming arguendo that MetroHealth's nepotism policy does not specifically apply to John, MetroHealth may transfer plaintiff Martha Sabol Wright based on the same policy concerns that caused it to promulgate its nepotism policy pursuant to its Policy No. II–6, which states:

 . III. *TRANSFERS*
 A. Employees may be transferred within their job classification to another department, nursing unit or shift anywhere within a medical center unit for reasons of meeting patient care needs, efficiency, economy, or other good reason.

J.A. 135.

*Smith v. Klein,* 23 Ohio App.3d 146, 148 n.1, 492 N.E.2d 852 (1985) (quoting *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235 (1977) (emphasis added)); *see Canderm Pharmacal v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). However, "in Ohio, 'one is privileged to purposely cause another not to perform a contract with a third person where he in good faith is asserting a legally protected interest of his own, which he believes will be impaired or destroyed by the performance of the contract.'" *Canderm Pharmacal,* 862 F.2d at 601 (quoting *Pearse v. McDonald's Systems of Ohio, Inc.,* 47 Ohio App.2d 20, 351 N.E.2d 788 (1975)). The factors determining whether a privilege exists are as follows:

(a) the nature of the actor's conduct,

(b) the nature of the expectancy with which his conduct interferes,

(c) the relations between the parties,

(d) the interests sought to be advanced by the actor and

(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

*Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1127 (6th Cir.1981); *Juhasz,* 55 Ohio App.2d at 57, 379 N.E.2d 235.

In their complaint, plaintiffs alleged that PHI and MetroHealth have a contract pursuant to which PHI provides MetroHealth with helicopters and pilots for its LifeFlight unit. Plaintiffs further alleged that "[t]he contract allows Metro to reject a pilot initially offered by PHI, but does not provide Metro with the right to remove or terminate PHI pilots." J.A. 16. In addition, plaintiffs alleged that MetroHealth requested that PHI transfer plaintiff John C. Wright, Jr. from the LifeFlight unit due to MetroHealth's belief that plaintiffs' marriage violated MetroHealth's nepotism policy.

■ We conclude that MetroHealth was privileged to request that PHI transfer plaintiff John C. Wright, Jr. from the LifeFlight unit by virtue of its contract with PHI. Pursuant to this contract, PHI supplied pilots to MetroHealth for its LifeFlight unit. Thus, MetroHealth had an interest in the employees that PHI provided MetroHealth. We note that plaintiffs did not allege that the contract forbade MetroHealth from requesting that an unsatisfactory pilot be removed from the LifeFlight crews. Therefore, we conclude that the district court did not err in dismissing plaintiffs' claim for tortious interference with a business relationship.

(2)

Plaintiffs also argue that the district court erred in dismissing their claim for intentional infliction of emotional distress. The Supreme Court of Ohio has defined the tort of intentional infliction of emotional distress as follows:

"One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

*Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 47, 570 N.E.2d 1076 (1991) (quoting *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 374, 453 N.E.2d 666 (1983)). Furthermore, "liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Yeager,* 6 Ohio St.3d at 375, 453 N.E.2d 666. Moreover, we have noted that the Ohio Supreme Court has defined "serious" emotional distress in the following manner:

"Serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

*Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 317 (6th Cir.1989) (quoting *Paugh v. Hanks,* 6 Ohio St.3d 72, 72, 451 N.E.2d 759 (1983) (quoting syllabus)). "Conversely, the Ohio Supreme Court has expressly indicated that '[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities ... [and that] [t]here is no occasion for the law to intervene in every case where someone's

**1140**

feelings are hurt.'" *Gagne*, 881 F.2d at 317–18 (quoting *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 153, 462 N.E.2d 392 (1984)).

In this case, plaintiffs merely allege that defendant MetroHealth requested that PHI transfer plaintiff John C. Wright, Jr. from the LifeFlight unit due to its belief that plaintiffs' marriage violated their nepotism policy. Moreover, plaintiffs do not allege that they suffered any serious emotional distress. We agree with the district court that "[t]he enforcement of the nepotism policy to the plaintiffs does not constitute such 'extreme and outrageous conduct' to state a claim for intentional infliction of emotional distress." J.A. 216.

### (3)

Finally, plaintiffs argue that the district court erred in dismissing their breach of Ohio public policy claim. Plaintiffs assert that "[d]efendant MetroHealth's efforts to remove John (or Martha) from their respective positions because of their marriage is contrary to Ohio's express policy favoring marriage." Plaintiffs' Brief at 36.

Under Ohio law, a cause of action arises when an employee is discharged or disciplined for a reason that breaches public policy. *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 234, 551 N.E.2d 981 (1990). The Supreme Court of Ohio has held open the possibility that it might recognize a public policy exception to the at-will doctrine that is not proscribed by statute; however, the court stated that the exception "would be required to be of equally serious import as the violation of a statute." *Id.* at 235, 551 N.E.2d 981.

In this case, plaintiffs claim that MetroHealth's nepotism policy violates Ohio public policy that strongly prefers marriage to cohabitation. However, as discussed earlier, we have concluded that MetroHealth's nepotism policy does not directly or substantially interfere with the right to marry. Furthermore, we find nothing in Ohio law that shows that nepotism policies violate Ohio public policy. Therefore, we conclude that plaintiffs failed to state a claim for breach of Ohio public policy. Accordingly, we hold

that the district court did not err in dismissing plaintiffs' pendent state law claims.

### III.

For the reasons stated, the judgment of the district court is **AFFIRMED**.