OPINION
Appellant, Professional Balance Company ("PBC"), is appealing from a jury verdict and a directed verdict against it as a result of a lawsuit it filed against appellees, Fulton Associates Balance Company ("FABC"), Don Fulton, and Dave Fulton. Appellees are cross-appealing a directed verdict against their counterclaims.
PBC is an air balancing company. The main duty of an air balancing company is to adjust the heating and air conditioning systems in new or renovated buildings. Don Fulton, the son-in-law of Don Burke, PBC's president and owner, worked at PBC as a balance engineer. He also had a title of vice president of the company. The present dispute arose when Don Fulton quit PBC, on June 25, 1996, and started his own air balancing company, FABC, in competition with PBC. Don's brother, Dave Fulton, also quit PBC on that date to work for FABC. Five of PBC's other employees subsequently quit to work for FABC.
PBC sued appellees, claiming: misappropriation of trade secrets; breach of fiduciary duty; tortious interference with a business relationship; and, unfair competition. Appellees filed a counterclaim asserting: abuse of process; tortious interference with a business relationship; and, slander. The case proceeded to a jury trial, held on June 16 and 17, 1997. From our review of the trial transcript, we determine that the following events occurred:
Don Burke started PBC in 1972. In 1974, he hired Don Fulton as a technician. A few years later, he hired Dave Fulton as an estimator. Dave was responsible for contacting building contractors about available jobs and bidding on them. Many other members of the Burke family worked for PBC, at different times and in different capacities.
On June 4, 1990, the shareholders elected Don Fulton to be a director of the corporation.[1] On the same date, Don Fulton was also elected Vice-President(Production) and Dave Fulton was elected Vice-President(Sales). The only evidence presented that Don was a director were minute sheets from the shareholders' and Board of Directors' meetings. Nothing from the record indicates that Don accepted the position as director, participated in any meetings with the board of directors, or knew that he was elected to be a director of the corporation. Similarly, although they were referred to as vice-presidents, no evidence indicates that either Don or Dave knew that they had been elected as vice-presidents of the corporation. Neither Don nor Dave explicitly admitted or denied knowledge of their fiduciary positions with PBC.
Over the years, Don Fulton and Don Burke had discussions regarding Don Burke eventually retiring and selling PBC to Don Fulton and some other employees. Many different sale proposals were discussed; none of which was satisfactory to the parties involved. At some point, Don Fulton began to believe that the sale would not work out to his satisfaction and looked into starting his own air balancing business.
The parties do not dispute that, in 1996, Don Fulton took the following actions in anticipation of possibly starting his own business: consulted an attorney in February; filed articles of incorporation in March; opened a corporate bank account in May; rented a small amount of office space for about $75 per month in April or May; purchased liability insurance; applied for and received certain loans; and, made other miscellaneous business expenditures.
Don Fulton claimed that most of these steps were taken as a preliminary matter, and that he did not make his final decision to leave PBC until June of 1996. He had never specifically told Don Burke that he was taking steps to start his own business until the day he quit PBC, without notice. Up to that point, he had, at most, told Don Burke that he would have to look out for his own interest if things did not work out with the sale of PBC.
The testimony indicates that, before he terminated his employment at PBC, Don Fulton had told some of his co-workers, including his brother Dave, that he was thinking about leaving and starting his own company and had inquired about whether they would be interested in leaving as well. Shortly after the Fultons left, three of PBC's technicians and two of its administrative staff joined FABC. One of the administrative staff members did some work in connection with starting the company, during her spare time, while still employed by PBC. As a result of the loss of these employees, PBC was severely short-handed and suffered a loss in average monthly sales of over $50,000. Because air balancing technicians are highly specialized employees who require about five years of training, PBC had trouble filling the vacancies left by their former employees.
Dave Fulton was PBC's estimator. He had, essentially, the same position and duties, locating and bidding on jobs, in his new job at FABC. The bidding process involved locating jobs through contact with customers and contractors or through the Builder's Exchange. Often, PBC and FABC obtained contracts because of Dave Fulton's relationship with different contractors who would contact him. Bidding was not a set process and involved a certain amount of negotiation. Sometimes, a contractor would call PBC or FABC to tell them that a competitor had bid less for a job, and offered them the job if they would match the competitor's bid. The evidence shows that it was not a strictly confidential process.
Appellant established that on his last day at PBC, Dave Fulton bid $36,000 on a contract with the Benjamin Rose Institute for PBC, then later bid $29,000 for the same contract while employed at FABC. The job was awarded to FABC. Appellant also established that Dave Fulton bid on numerous contracts while employed at FABC that he had also bid on while employed at PBC. Don Burke and the Fultons testified that many of the bids submitted by FABC were lower than PBC's bids, and that FABC got a majority of those jobs. Don Burke further testified that because of FABC's lower bids, PBC lost $217,060 in sales.
Appellees moved for directed verdict at the end of appellant's case, which the trial court denied. At the end of the appellee's case, both appellant and appellees moved for directed verdicts on all counts. The trial court granted appellant's motion for a directed verdict on appellees' counterclaims and granted appellees' motion for a directed verdict on all counts of appellant's complaint, except for the breach of fiduciary duty claim against Don Fulton.
The issues before the jury with regard to the breach of fiduciary claim were: whether Don Fulton was a director of PBC; whether while he was a director, and still employed by PBC, he set up a business in direct competition with PBC; whether while he was a director, and still employed by PBC, he usurped corporate opportunities from PBC; and, whether while he was a director, and still employed by PBC, he recruited PBC employees for his own business. The jury returned a verdict, filed on June 19, 1997, in favor of appellee. On July 3, 1997, appellant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial on the breach of fiduciary duty claim, and for a new trial on the tortious interference claim. The trial court denied this motion.
Appellant raises the following assignments of error for our review:
 "[1.] The trial court erred to the prejudice of the plaintiff when it denied plaintiff's motion for a judgment not withstanding the verdict on plaintiff's claim of a breach of fiduciary duty by defendant Donald Fulton.
 "[2.] The court erred to the prejudice of the plaintiff when it granted defendant's motion for a directed verdict on plaintiff's claims for tortious interference with business relations.
 "[3.] The trial court erred to the prejudice of the plaintiff when it denied plaintiff's motion for a judgment not withstanding the verdict on plaintiff's claim of tortious interference with business relationships by defendant Donald Fulton."
 Appellees cross-appeal and raise the following assignment of error for our review:
 "[1.] The trial court erroneously granted plaintiff's motion for a directed verdict on defendant's abuse of process counterclaim."
 Appellees' assignment of error asserts that the trial court erred by granting a directed verdict on their abuse of process claim. Appellees claim that there is evidence upon which reasonable minds could conclude that the legal proceeding was perverted to accomplish something for which it was not designed; and, therefore, a directed verdict was not appropriate. Appellant counters that it did nothing more than carry out the lawsuit to its authorized conclusion, and therefore, is not liable.
In deciding whether to grant a motion for a directed verdict or a judgment notwithstanding the verdict, a trial court must construe all of the evidence most strongly in favor of the party against whom the motion was made, and, where there is substantial evidence to support its side of the case, upon which reasonable minds may reach a different conclusion, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon either of the above motions. Posin v. A.B.C. Motor Court Hotel, Inc.
(1976), 45 Ohio St.2d 271, 275; 344 N.E.2d 334.
The elements of the tort of abuse of process are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process. Yaklevich v. Kemp, Schaeffer Rowe Co.,L.P.A. (1994), 68 Ohio St.3d 294, 298; 626 N.E.2d 115. A jury could have found appellant liable for abuse of process if it found, by the greater weight of the evidence, that appellant made an improper use of process for an ulterior motive and that it caused damage to appellees. 2 Ohio Jury Instructions (1997) Section 200.03(4). When determining whether a proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed, there is no liability for abuse of process where appellant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.Yaklevich at fn. 2.
In its counterclaim, appellees claimed that appellant perverted the process by pursuing spurious claims of theft of confidential records and unfair competition without evidence, conducted abusive discovery, and used the litigation as a weapon for settling a family score. The only evidence introduced to support appellees' claim was the testimony of Don Burke's daughter-in-law, who was called by appellees and was still employed by appellant. She testified that Don Burke wanted to put appellees out of business for two years. As a result, appellees contended, their business operations were disrupted, causing financial loss.
While the discovery may have been burdensome and disruptive to the Fultons, no evidence shows that appellant engaged in abusive discovery practices. The evidence, at best, shows no more than a generalized bad intention and ill will on the part of Don Burke, who is not a party to this action. For parties to a dispute to end up in litigation, there is often bad intent, or a wish for revenge, on the part of one or both parties. To hold parties liable for abuse of process and allow trials for any such claim, with no other evidence than having a general "bad intent," would create major difficulties for our justice system. Beyond one unsupported, conclusory assertion, appellees failed to produce any evidence to demonstrate how the process was perverted beyond the normal prosecution of a lawsuit. Therefore, appellees' cross-assignment of error has no merit.
In appellant's first assignment of error, it argues that the trial court erred by not granting appellant's judgment notwithstanding the verdict on its breach of fiduciary duty complaint against Don Fulton. Though they may have had claims for breach of fiduciary duty against both Fultons for their acts as agents of the corporation, appellant's appeal addresses only Don Fulton's fiduciary duty in his role as a director. Appellant claims that Don Fulton was a director of PBC and that as a director, and while still employed by PBC, he: set up a business in direct competition with PBC; usurped corporate opportunities from PBC; and, recruited PBC employees for his own business. Appellee argues that Don Fulton was not a director, and that, if he were, he did nothing to breach his fiduciary duty.
Although he never explicitly denied that he was a director, there is sufficient evidence by which a finder of fact could conclude that Don Fulton was not a director. The only evidence that Don Fulton was a director of PBC were the minutes of the shareholders' meeting where he was elected director. No evidence was presented that he accepted the position, that he ever participated in any directors' meetings, or that he performed any corporate functions as a director. One cannot involuntarily become a director of a corporation. Under such a framework, a corporation could effectively eliminate its competition by electing any possible competitor to its board of directors, then bringing suit for breach of fiduciary duty for any who tried to compete with it.
Even had the jury concluded that Don Fulton was a director of PBC, there was ample evidence by which the jury could conclude that he breached no fiduciary duty. The jury could have found, based on Don Fulton's testimony, that his telling Don Burke that he would have to look out for his own interests, if the sale of PBC did not work out, was sufficient to satisfy his duty to fully disclose his competition with PBC. The jury was also presented with sufficient evidence to conclude that Don Fulton took only preparatory steps to start FABC while still employed by PBC and did not actually compete until after he left; so, he therefore did not usurp corporate opportunities from PBC while still a director. Further, the jury was presented with evidence sufficient to conclude that, the bidding process was informal; and, that although Don Fulton's knowledge of PBC's bids on certain projects may have given him some advantage, it was not the cause of PBC's loss of those contracts. In light of this evidence, the trial court's denial of appellant's judgment notwithstanding the verdict was proper, and appellant's first assignment of error is without merit.
We will address appellant's second and third assignments of error, both involving its claim for tortious interference, together. In its second assignment, appellant disputes the trial court's granting a directed verdict and, in its third assignment, appellant disputes the trial court's denial of its motion for a new trial. Appellant claims appellee, Don Fulton, tortiously interfered with its business relationships with its employees. Appellee claims that he did nothing improper because the employees decided to leave under their own free will and he did nothing to coerce them to leave. These assignments of error do not address any possible claims of tortious interference for interfering with PBC's relationships with its potential customers.
Appellant's tortious interference claim addresses exactly the same facts that were presented to the jury in its breach of fiduciary duty claim. Appellant argued that appellee breached his fiduciary duty by recruiting PBC's employees while a director of the corporation. Due to the directed verdict, the question of whether he also tortiously interfered with PBC's employees by breaching his fiduciary duty was not submitted to the jury for a decision. In overruling appellant's motion for a new trial, the trial court found that appellant failed to present any evidence of illegal or independently actionable conduct by Don Fulton, or of any damages that proximately resulted from the loss of the employees. It further found that Don Fulton's actions were justified acts of competition. Appellant argues that Don Fulton was a director of the corporation at the time he interfered with appellant's employees, and was, therefore, not a competitor.
The elements of the tort of tortious interference are: (1) a business relationship or contract; (2) the wrongdoers knowledge of the relationship or contract; (3) the wrongdoers intentional or improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of a privilege or justification; and, (5) resulting damages.A B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg. Construction Trades Council (1995), 73 Ohio St.3d 1, 14;651 N.E.2d 1283; Kenty v. Transamerica Premium Ins. Co. (1995),72 Ohio St.3d 415, 419; 650 N.E.2d 863; Doyle v. Fairfield MachineCo., Inc. (1997), 120 Ohio App.3d 192, 216; 697 N.E.2d 667, 683.
Under Ohio law, not all interferences with a contract are actionable, only improper interferences. Ohio courts are guided by the Restatement of Torts, which sets forth the following factors for determining whether interferences with contractual relations are tortious: the nature of the actor's conduct; the nature of the expectancy with which his conduct interferes; the relations between the parties; the interest sought to be advanced by the actor; and, the social interests in protecting the expectancy on one hand and the actor's freedom of action on the other hand. Juhasz v. Quik Shops, Inc. (1977), 55 Ohio App.2d 51;379 N.E.2d 235, 238, quoting 4 Restatement of the Law 2d, Torts (1979) Section 767.
As appellant concedes, Section 768 of the Restatement contains a specific exception or privilege to interfere with a business relationship for business competitors. After appellee started FABC, he became a competitor of PBC, and was justified in recruiting his former co-workers. Had the jury found that appellee recruited PBC's employees in breach of his fiduciary duty to PBC, then he improperly abused his position of trust, constituting interference sufficient to provide the basis for tortious liability. Contract Crush and Screen Co. v. Jack F. NeffSand Gravel Inc. (Mar. 7, 1997), Lake App. No. 96-L-043, unreported.
On this issue, we agree with appellant that he produced evidence sufficient to overcome appellees' motion for a directed verdict; however, error by the trial court in granting appellees' motion was harmless. The jury considered the same facts on the breach of fiduciary duty claim that were presented for the tortious interference claim. By finding that appellee did not breach its fiduciary duty, the jury found that appellee had not acted improperly. No other facts were alleged or presented by appellant. Thus, the jury could not have found that Don Fulton improperly interfered with PBC's business relationships, once it determined there had been no breach of fiduciary duty.
Therefore, appellant's second and third assignments of error are without merit. We affirm.
FORD, P.J., and CHRISTLEY, J., concur.
[1] Appellant at trial presented the minutes of the meetings of the Board of Directors and shareholders. The minutes showed that the only people present at the shareholders' meeting were Don Burke and his wife, Sharon Burke, who was also the corporation's secretary. The minutes further showed that Don Burke was the sole shareholder of the corporation. The minutes for the Board of Directors meeting showed that Don Fulton was present. However, Don Fulton did not sign the minute sheet, though signed by Don and Sharon Burke. No other evidence on the record would indicate that any notice was given of the meeting. Both meetings were held on June 4, 1990, at 37903 Euclid Avenue, Willoughby, Ohio.